**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

JAMES MICHAEL MARCH,      )
                                   )
          **Plaintiff,**      )
                                   )      **CIVIL ACTION**
**v.**                           )
                                   )      **No. 18-2047-JWL**
NANCY A. BERRYHILL,      )
**Acting Commissioner of Social Security,**      )
                                   )
          **Defendant.**      )
_____ )

**MEMORANDUM AND ORDER**

Plaintiff seeks review of a decision of the Acting Commissioner of Social Security (hereinafter Commissioner) denying Disability Insurance Benefits (DIB) pursuant to sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (hereinafter the Act). Finding no error, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

## I.    Background

Plaintiff argues that the Administrative Law Judge (ALJ) erred in his residual functional capacity (RFC) assessment, failed his duty to develop the record, erroneously rejected Plaintiff's allegations of symptoms, and failed to consider properly the Medical-Vocational Guidelines (the Grids).

The court's review is guided by the Act.  <u>Wall v. Astrue</u>, 561 F.3d 1048, 1052 (10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court must determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether he applied the correct legal standard.  <u>Lax v. Astrue</u>, 489 F.3d 1080, 1084 (10th Cir. 2007); <u>accord</u>, <u>White v. Barnhart</u>, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>see also</u>, <u>Wall</u>, 561 F.3d at 1052; <u>Gossett v. Bowen</u>, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005); see also, Bowling v. Shalala, 36 F.3d 431, 434 (5th Cir. 1994) (The court "may not reweigh the evidence in the record, nor try the issues de novo, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision.") (quoting Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988)).  Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by

other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability.  20 C.F.R. § 404.1520; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether he has a severe impairment(s), and whether the severity of his impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's RFC.  20 C.F.R. § 404.1520(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process-- determining at step four whether, considering the RFC assessed, claimant can perform his past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, claimant is able to perform other work in the economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.

At step five, the burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).

The court considers the issues in the order presented in Plaintiff's Brief, except it first considers Plaintiff's claim the ALJ failed his duty to develop the record.

## II.    Duty to Develop the Record

In a single paragraph, Plaintiff claims error because the ALJ failed to secure a medical opinion regarding Plaintiff's physical and mental abilities from a treating or examining source.  (Pl. Br. 16-17).  He argues, "The ALJ is precluded from relying on his own 'medical expertise' in establishing the RFC."  Id. at 16 (citing Kemp v. Bowen, 186 816 F.2d 1469, 1476 (10th Cir. 1987)).

### A.    The Duty

The Commissioner "has broad latitude in ordering consultative examinations."  Hawkins v. Chater, 113 F.3d 1162, 1166 (10th Cir. 1997).

> The ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised.  This is true despite the presence of counsel, although the duty is heightened when the claimant is unrepresented.  The duty is one of inquiry, ensuring that the ALJ is informed about facts relevant to his decision and learns the claimant's own version of those facts.

Henrie v. U.S. Dep't of Health & Human Servs., 13 F.3d 359, 360-61 (10th Cir. 1993) (citations, quotations, and brackets omitted).  Further, under 20 C.F.R. § 404.1512(e), "[w]hen the evidence [the agency] receive[s] from [a claimant's] treating physician or psychologist or other medical source is inadequate for [the agency] to determine whether [the claimant is] disabled,

[the agency] will need additional information to reach a determination or a decision."

Cowan v. Astrue, 552 F.3d 1182, 1187 (10th Cir. 2008).

**B.** **Analysis**

The court finds no error in this regard. Plaintiff has not demonstrated that the ALJ in this case was uninformed regarding the facts in the case, or regarding Plaintiff's own version of those facts as required by Henrie. Moreover, he has not shown that the record evidence is inadequate to determine whether Plaintiff is disabled. The cases cited by Plaintiff do not require a different result. In Kemp, "there was not even evidence from a consulting physician retained by the agency to contradict the medical diagnosis, findings, and conclusions of her treating physician." Kemp, 816 F.2d at 1476. Here, on the other hand, there are opinions from state agency consulting physicians and psychologists and there are reports from both a physician and a psychologist who examined Plaintiff, and there is no medical opinion from a treating physician or psychologist which is contrary to the opinions relied upon or to the RFC assessed by the ALJ. In Baker v. Barnhart, 84 Fed. App'x 10, 14 (10th Cir. 2003), "the only document in the record that could conceivably support [the ALJ's] conclusion [wa]s a checkmark-style RFC assessment done by an agency medical consultant." Here, there is much more upon which the ALJ could, and did, rely to make an RFC assessment.

**III.** **RFC Assessment**

**A.** **Physical Limitations**

Plaintiff claims error in assessing his physical limitations because the ALJ accorded significant weight to the opinion of Dr. Braverman, the state agency physician, despite that Dr. Braverman is an ophthalmologist and his opinion was rendered without the benefit of almost two years of record medical evidence. (Pl. Br. 14-16). He claims the ALJ's finding of adequate sleep is clearly not the case because of results of his sleep study on April 3, 2017. Id. at 17.

The ALJ did not err in evaluating Dr. Braverman's opinion. As an ophthalmologist, Dr. Braverman is a physician qualified to render a medical opinion. While he is not a specialist in the medical issues presented in this case, specialization is but one of the regulatory factors for evaluating a medical opinion, and Plaintiff does not point to any medical opinion contrary to that of Dr. Braverman, particularly that of a specialist relevant here. Dr. Braverman is an agency consultant physician who, as the Commissioner points out, "is a specialist in disability evaluation, and the regulations provide that such expertise and heightened understanding of the agency's disability programs is a factor when determining the weight to give an opinion." (Comm'r Br. 6) (citing 20 C.F.R. § 404.1427(c)(6)).

As the Commissioner argues, "the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir. 2004). "And the ALJ's RFC assessment is an administrative, rather than a medical determination." McDonald v. Astrue, 492 F. App'x 875, 885 (10th Cir. 2012) (citing Social Security Ruling (SSR) 96-05p, 1996 WL 374183, at *5 (July 1996)). Because RFC assessment is made based on "all of the evidence in the record, not only the

medical evidence, [it is] well within the province of the ALJ." <u>Dixon v. Apfel</u>, No. 98-5167, 1999 WL 651389, at **2 (10th Cir. Aug. 26, 1999); 20 C.F.R. § 404.1545(a). Moreover, the final responsibility for determining RFC rests with the Commissioner. 20 C.F.R. §§ 404.1527(e)(2), 404.1546. Consequently, the fact that Dr. Braverman's opinion was formulated almost two years before the ALJ's decision issued is of no consequence because the ALJ considered all the evidence, medical and nonmedical, including that submitted after Dr. Braverman formed his opinion, and assessed Plaintiff's RFC on that basis.

Plaintiff's reports of fatigue and insomnia were also considered by the ALJ who found, as Plaintiff acknowledges, that "Plaintiff's reports to the psychological consultative examiner, Dr. Kovach, and [to] his medical provider indicated showed [sic] 'adequate' sleep." (Pl. Br. 17) (quoting R. 36). Plaintiff does not argue that the evidence in the administrative record does not support that finding. Rather, he cites a sleep study performed on April 3, 2017, after the ALJ decision issued on January 12, 2017, and argues that findings of that study show that the ALJ's finding "is clearly not the case." <u>Id.</u> (citing R. 14). The sleep study relied upon by Plaintiff was submitted to the Appeals Council, which found that it "does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before January 12, 2017." (R. 2). The Council explained, "If you want us to consider whether you were disabled after January 12, 2017, you need to apply again." <u>Id.</u>

Plaintiff does not argue that the Council erred, and he has not sought a sentence six remand for the sleep study to be made a part of the administrative record in this case.

Therefore, the court may not consider that evidence in its judicial review. Moreover, even if the court were to consider the sleep study relied upon by Plaintiff, it would not find it "clearly" shows that Plaintiff's reports to Dr. Kovach, and to his medical provider of adequate sleep were "not the case." The results of the sleep study were diagnoses of chronic insomnia disorder, and unspecified hypersomnia, with no evidence of obstructive sleep apnea or significant sleep disordered breathing. (R. 14). And the report noted that "[f]urther history is recommended to see if additional work-up/treatment is warranted for the patient's insomnia and hypersomnia." Id. (bolding omitted). Plaintiff's reports to Dr. Kovach and to his medical provider are a part of that "further history" recommended, and as the ALJ found they suggest Plaintiff was receiving adequate sleep.

### B.    Mental Limitations

Plaintiff claims the ALJ erred in failing to assess limitations in his ability to interact with supervisors, in his ability to perform math functions, and in various mental abilities related to sustained concentration and persistence. (Pl. Br. 18-19). The Commissioner argues that the representative jobs cited by the vocational expert and relied upon by the ALJ consider interactions with supervisors and co-workers as a single job element, and Plaintiff's other arguments misunderstand the difference between evaluating the severity of mental impairments at steps two and three of the sequential evaluation process, and assessing RFC between steps three and four of the process. (Comm'r Br. 7-8). In his Reply Brief, Plaintiff argues that the Commissioner's argument regarding representative jobs is erroneously based on the O*NET (Occupational Information Network), not the DOT (Dictionary or Occupational Titles). (Reply 5-6) (quoting

Poissant v. Colvin, No. 2:13-cv-162-GZS, 2014 WL 1686816, *7 (D. Maine April 29, 2014) (citing Earls v. Comm'r of Soc. Sec., No. 1:09 CV 01465, 2011 WL 3652435, *7 (N.D. Ohio Aug. 19, 2011))).  He argues that Dr. Kaspar distinguished between the public, co-workers, and supervisors, and that the DOT job description for a marker, at least, requires "interaction with supervisors such as notifying the supervisor of discrepancies."  (Reply 6).

Regarding his mental RFC, the ALJ found that Plaintiff

can understand and carry out simple, routine, repetitive tasks with few workplace changes.  He cannot work fast-moving assembly line-type work.  The claimant cannot interact with the public.  He can be around coworkers throughout the day, but with only brief incidental interaction with coworkers and no tandem job tasks requiring cooperation with coworkers.

(R. 30) (finding no. 5) (bolding omitted).

As Plaintiff suggests, Dr. Kaspar noted Plaintiff is moderately limited in the mental abilities (among others): to accept instructions and respond appropriately to criticism from supervisors; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (R. 124-25).  Dr. Kaspar also provided a narrative opinion and summarized his functional assessment:

Tasks = able to understand and follow simple instructions.
Problem Solving/Judgment = impaired
Motivation is questionable.  Social Interactions: affected by difficulty controlling anger

9

Attention, Concentration = below average; Memory functions are below average, though near normal for meaningful information.

The CL[(claimant)] is able to understand and follow simple instructions, perform SRRTs [(simple, routine, repetitive tasks)] w /minimal changes in routine, and limited social interaction. The MRFC [(Mental RFC)] is effective 3 months prior to the CE [(consultative examination) (of Dr. Kovach)] as there is minimal information regarding the mental impairments in the CL's MER [(medical evidence of record)].

(R. 126).

The court agrees with Plaintiff that the DOT, not the O*NET, controls consideration of job data in the Social Security disability determination context. 20 C.F.R. § 404.1566(d). And, the court will assume that it was error for the ALJ to fail to explain Plaintiff's capacity for interaction with supervisors. However, Plaintiff has not shown prejudice in that error. He argues that if the ALJ's hypothetical had included "any limitation on Plaintiff's ability to interact with supervisors," it "would likely have precluded all work and, in particular, the job of marker (DOT 209.587-034) which provides interaction with supervisors such as notifying the supervisor of discrepancies." (Pl. Br. 18), (Reply 6). Plaintiff suggests no particular limitation on his ability to interact with supervisors, points to no evidence of such a limitation other than Dr. Kaspar's opinion, and assumes that Plaintiff is <u>unable</u> to interact with supervisors. However, as quoted above, Dr. Kaspar opined that Plaintiff's social interactions are affected by his difficulty controlling anger, and found that he can perform simple, routine, repetitive tasks with "<u>limited</u> social interaction." (R. 126). Based upon this, the ALJ found that Plaintiff cannot interact with the public, can be around coworkers with brief incidental interaction, and no tandem job tasks requiring cooperation with coworkers. (R. 30).

Thus, to perform work, Plaintiff must have the ability for social interaction at work to interact with coworkers briefly and incidentally with no tandem job tasks, and with whatever supervision is normally required to perform simple, routine, repetitive tasks in unskilled jobs. It is reasonable to assume that the supervision required in such work when added to such minimal interaction with co-workers would not exceed the "limited social interaction" of which Dr. Kaspar found Plaintiff capable.

Plaintiff has not shown otherwise. In the DOT, each of the representative jobs relied upon by the ALJ states that the "People" function of that job is "8 Taking Instructions-Helping," and that function is "Not Significant." See DICOT 209.587-034, 1991 WL 671802 (Marker); DICOT 222.587-038, 1991 WL 762123 (Router); DICOT 208.685-010, 1991 WL 671753 (Collator Operator). The DOT defines People function 8 as, "Attending to the work assignment instructions or orders of supervisor. (No immediate response required unless clarification of instructions or orders is needed.) Helping applies to 'non-learning' helpers," and "8" is the least complex "People" relationship. DOT, App'x B, Explanation of Data, People, and Things, available online at https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPB.HTM (last visited Nov. 5, 2018). Clearly, interaction with supervisors in all of these representative jobs is "limited." As Plaintiff argues, the Marker job suggests that the job requires the worker to "notify supervisor of discrepancies." DICOT 222.587-038. However, that requirement is within a "May" item of the job definition which "describe[s] duties required of workers in this occupation in some establishments but not in others. The word 'May' does not indicate that a worker will sometimes perform this task but rather that some workers in

different establishments generally perform one of the varied tasks listed." DOT, Parts of the Occupational Definition, available online at https://www.oalj.dol.gov/PUBLIC/DOT/ REFERENCES/DOTPARTS.HTM (last visited Nov. 5, 2018). In context, and absent a showing that discrepancies are frequent occurrences, the requirement that in some establishments a "marker" notifies supervisors of discrepancies, does not require that the worker have more than limited social interaction. Plaintiff has shown no prejudice, and the ALJ's error in this regard is harmless.

Plaintiff's argument regarding math functions is to a similar effect. Plaintiff's suggestion that the ALJ should have assessed limitations in Plaintiff's ability to perform math functions is based on his interpretation of Dr. Kovach's Psychological Assessment, wherein Dr. Kovach reported:

> Attention and concentration seemed below average. He responded to all questions and tasks and repeated 3 unrelated words immediately after presentation. Faced with simple arithmetic problems, he sometimes forgot the question, was slow, and made 3 errors of which he was able to correct two when asked to think again. During serial 3 additions he proceeded at a very slow pace with 1 error. During serial 7 subtractions he was extremely slow, made 2 errors within the first 4 steps, started over, and this time made 1 error within a 6-step sequence. He counted backward from 20 to 1 at a slow tempo without omissions and spelled 2 familiar 5-letter words forward correctly but had trouble with spelling them backwards. For example, the word "world" she [sic] spelled backwards first as DLUOW but got it right during the 2nd attempt. The word "learn" he started to spell backward but asked after the first letter, "What was the word?" During a 3rd attempt he finally got it right. He repeated 5 digits forward and 4 digits backward.

(R. 388) (underline in original).

The problem with Plaintiff's claim of error is that he is attempting to use Dr. Kovach's report for a purpose for which it was not intended. Dr. Kovach's report is a

psychological assessment. (R. 386-89). The portion of that report quoted above, upon which Plaintiff relies, reflects the raw results of the "attention and concentration" portion of Dr. Kovach's "Mental Status Examination." (R. 386-87). It says very little, if anything, about Plaintiff's ability to perform math, it is designed to assess attention and concentration. Not surprisingly, in the "Diagnostic Impression" section of her report Dr. Kovach stated that Plaintiff's "responses during this exam indicate below average attention and concentration," but she said nothing regarding his math abilities. (R. 388-89). Moreover, Dr. Kasper reviewed Dr. Kovach's report and neither in his summary of Dr. Kovach's report nor in his functional assessment did he say anything regarding math abilities. (R. 126).

Plaintiff's argument that each of the representative jobs identified by the vocational expert and relied upon by the ALJ "require the ability to add and subtract two-digit numbers, multiply and divide 10's and 100's by 2, 3, 4, and 5 as well as perform operations with units such as cup, pint, and quart, inch, foot, and yard, ounce, and pound," is merely another red herring irrelevant to the issues before this court. (Pl. Br. 19). As noted above, there is simply no evidence before this court establishing that Plaintiff is unable to perform the math requirements he quotes above. The source of Plaintiff's argument is the fact that each of the jobs relied upon by the ALJ requires Math level 1, which is defined in the DOT by the requirements quoted above from Plaintiff's Brief. See DICOT 209.587-034 (Marker); DICOT 222.587-038 (Router); DICOT 208.685-010 (Collator Operator). Further, math level 1 is the lowest level of math development. DOT, App'x C, Components of the Definition Trailer, available online at:

https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM (last visited

Nov. 5, 2018).

Plaintiff's last argument regarding mental RFC meets with no more success.

Plaintiff cites each of the mental abilities in the sustained concentration and persistence

section of the Mental RFC Assessment that Dr. Kaspar rated as "moderately limited," and

argues that the ALJ should have included these limitations in the RFC assessed, and if he

had done so all work would be precluded. (Pl. Br. 19). However, Plaintiff

misunderstands Dr. Kaspar's opinion. As quoted above, Dr. Kaspar expressly stated his

narrative opinion and summarized his functional assessment. (R. 126). The ALJ

expressed his RFC assessment based, in part, on his determination to accord significant

weight to Dr. Kovach's opinion and to give more weight to Dr. Kaspar's explanation of

his opinion than to his ratings of the individual mental abilities. (R. 36) (citing Ex. 7F/5-

6 (R. 388-89), Ex. 3A/15 (R. 126), and Ex. 3A/13-14 (R. 124-25) (according only little

weight)). The ALJ's evaluation is supported by the record evidence, and is a reasonable

evaluation. While it would be possible to accord greater weight to the individual

"moderately limited" assessments of Dr. Kaspar, Plaintiff has not demonstrated that such

a result is required by the record evidence. The mere fact that there is evidence which

might support a contrary finding will not establish error in the ALJ's determination.

"The possibility of drawing two inconsistent conclusions from the evidence does not

prevent an administrative agency's findings from being supported by substantial

evidence. [The court] may not displace the agency's choice between two fairly

conflicting views, even though the court would justifiably have made a different choice

had the matter been before it de novo." Lax, 489 F.3d at 1084 (citations, quotations, and bracket omitted); see also, Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966) (same). Plaintiff has shown no error in the ALJ's RFC assessment.

## IV.     Plaintiff's Allegations of Disabling Symptoms

Plaintiff claims that the ALJ erred in weighing Plaintiff's allegations of disabling symptoms because he improperly relied on Plaintiff's statement that he enjoyed rehabilitating houses, on Plaintiffs receipt of unemployment benefits, on Plaintiff's thought that he could teach HVAC, and on the fact that Plaintiff was laid off from his last job; and failed to give adequate weight to Plaintiff's excellent work record. (Pl. Brief 20-21). The Commissioner argues that the ALJ properly evaluated Plaintiff's allegations of symptoms, that his evaluation was "very thorough and well-reasoned, and the [c]ourt should decline to disturb that evaluation." (Comm'r Br. 10) (citing Diaz v. Sec'y of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990)).

### A.     The ALJ's Findings Regarding Plaintiff's Allegations

The ALJ stated he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 96-4p." (R. 30). He explained the two-step process he applied to determine the consistency of Plaintiff's allegations of symptoms, and noted Plaintiff's allegations that "he was disabled due to depression, anxiety, insomnia, and arthritis of the spine. Plaintiff reported he was tired all of the time, and his depression and anxiety caused him to withdraw from any situation of confrontation." Id. at 31 (citations omitted). The ALJ

found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 31).

The ALJ noted that a healthcare provider told Plaintiff he would not prescribe pain medication for mild symptoms (R. 31-32) (citing Ex. 10F/15 (R. 410)), and that Plaintiff left the emergency department after a visit in August 2016, "with a quick, steady gait." Id. at 32. He noted minimal examination findings at a consultative physical examination in March 2015, found those findings "were consistent with the observation of the examining psychologist that the claimant had no obvious physical or sensory impairment." Id. (citing Ex. 9F/2-4 (R. 392-94), and Ex. 7F/4 (R. 387)). The ALJ noted that Plaintiff worked a number of years despite back pain, and in March 2012 he "told his primary care provider he enjoyed rehabilitating houses (Exhibit 2F/38 [(R. 342)]), which would have required more exertion than needed to perform light work." (R. 32). He found, "In contrast to the claimant's testimony at the hearing of difficulties with sitting and standing due to back pain, the claimant did not report these limitations at medical appointments. These inconsistencies diminish the claim of an inability to perform a range of light work." Id.

Concerning Plaintiff's alleged mental impairments, the ALJ noted that Plaintiff stated on two occasions, December 2015 and May 2016, that his psychiatric symptoms did not affect his daily functioning, but in August 2016 he reported "his psychiatric symptoms made him unable to function fully throughout the day," even though he was living part-time in two states. Id. at 33 (citing Ex. 10F/6, 9, 12, 17 (R. 401, 404, 407,

412)).  The ALJ found that Plaintiff's statement to his primary care provider regarding

marijuana use "was inconsistent with his reports at the emergency department and to

subsequent mental health providers."  (R. 34).  The ALJ finished his summary:

> The claimant testified at the hearing that toward the end of his tenure at
> work, his job duties were changed, and he was required to go on more sales
> calls.  He also said some employees who had quit had placed some things
> in the exit interview.  The claimant said he was [sic] attendance problems,
> as he was not as willing to go on sales calls, although he previously had
> duties that included selling projects.  The claimant's allegation was
> inconsistent with his report to the consultative psychologist that he knew of
> no performance issues that would cause him to receive notice that his job
> was being eliminated and his claim he had made the company millions of
> dollars.  The claimant's receipt of unemployment benefits for a time
> (Exhibit 4D [(R. 217)]) also suggests a departure for business reasons rather
> than for performance reasons.  His testimony at the hearing that his job had
> changed to include duties he did not prefer is not consistent with an
> inability to work.  Similarly, his applications for many jobs, but no offers,
> as he reported to his mental health treatment provider, do not diminish an
> ability to perform work.  The claimant's appearance of some resentfulness
> at the consultative examination suggests questions of effort on mental status
> functioning.  The claimant also was inconsistent in reporting his education
> and intellectual background.  He told the consultative psychologist he was
> dyslexic and defiant, and he went to a special vocational school (Exhibit
> 7F/3 [(R. 386)]).  At the hearing, the claimant testified he went to a
> vocational program where he had few "core" classes.  In contrast, he denied
> initially attending any special education classes (Exhibit 2E/3 [(R. 238)]).
> Implications that he alleged he lacked the intellectual capacity for work
> were inconsistent with the claimant's work history.

(R. 35).

### C.    Analysis

As noted above, the ALJ expressed many inconsistencies in the record evidence

upon which he based his determination to discount Plaintiff's allegations of disabling

symptoms, and that determination is supported by the record evidence.  Plaintiff attacks

the ALJ's use of certain of those inconsistencies, but the court finds no error.  While, as

Plaintiff points out, the statement that he enjoyed rehabilitating houses occurred more than a year and a half before his alleged onset of disability, that does not preclude the ALJ's use of that statement. In context, the ALJ relied upon the fact Plaintiff had worked for a number of years despite his pain, and he illustrated that fact by noting that in March 2012 (while he was working) Plaintiff told his primary care provider he enjoyed rehabilitating houses. This is not error.

The ALJ's consideration of Plaintiff's loss of his last job and of his receipt of unemployment benefits is to a similar effect. Plaintiff lost his last job on December 31, 2013 due to a reduction in force. (R. 247). The ALJ noted that Plaintiff received unemployment income in 2014. (R. 28). As the ALJ noted, Plaintiff's hearing testimony that he had attendance problems was inconsistent with his report to the consultative psychologist that he knew of no performance issues, and his receipt of unemployment benefits was inconsistent with losing his last job because he was unable to work. (R. 35). Moreover, Plaintiff's testimony that his job duties changed to include duties he did not like and was unwilling to do, is inconsistent with an inability to work. Id. This is not an erroneous use of Plaintiff's job loss or of the receipt of unemployment benefits. The fact that Plaintiff advances a different explanation of these facts does not change the result. As noted above, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Lax, 489 F.3d at 1084.

Plaintiff argues the ALJ should not have used his thought that he could teach HVAC because the "desire to work, however, does not mean an individual can actually

work." (Pl. Br. 20). However, in context the significance of Plaintiff's thinking that he can teach HVAC is not the desire to work, but the fact that Plaintiff's belief he can work is inconsistent with his allegation that he cannot work. This is no error.

Finally, Plaintiff complains that the ALJ did not appropriately credit his "excellent work record with good wages." Id. While Plaintiff is correct that Plaintiff consistently worked many years with good wages, he has not established that fact should outweigh the numerous inconsistencies found by the ALJ. Moreover, the ALJ considered Plaintiff's work history, and found it inconsistent with his implied allegation that "he lacked the intellectual capacity for work." (R. 35). The ALJ's evaluation of Plaintiff's allegations is supported by substantial evidence, and Plaintiff has shown no error.

## V.      Use of the Medical-Vocational Guidelines

Plaintiff claims the ALJ erred in applying the Grids in this case because he mechanically applied the age categories by applying the category of "an individual closely approaching advanced age" to Plaintiff despite that he "was just a few months shy of his 55th birthday" at which he would become "an individual of advanced age," and according to Grid rule 202.06 must be found disabled. (Pl. Br. 21-22) (citing 20 C.F.R § 404.1563(b); and 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.06). The Commissioner argues that the ALJ did not apply the Grids, but merely used the Grids as a framework for his decision. (Comm'r Br. 11). She argues further that rule 202.06 applies only if the individual has no transferable skills, and there is no evidence in this regard in the record because that question was not asked, and the vocational expert did not testify in that regard. Id. at 12. In his Reply Brief, Plaintiff reiterates his argument, argues that it was

the ALJ's error in failing to seek expert testimony regarding transferable skills, and argues that remand is the proper remedy to consider both transferable skills and the older age category. (Reply 9-10).

This issue can be decided on the basis of Plaintiff's argument and without considering the necessity of testimony regarding transferable skills. As Plaintiff quoted in his Brief, the Commissioner has promulgated a regulation which provides:

> We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

20 C.F.R. § 404.1563(b) (emphasis added).

It is necessary and permissible to draw lines between categories in social welfare programs. Califano v. Arzavorian, 439 U.S. 170, 174 (1978). And there are no fixed guidelines regarding when a borderline situation exists. The Tenth Circuit has found that an individual within six months of the next age category might be in a borderline situation, Cox v. Apfel, No. 98-7039, 1998 WL 864118, *4 (10th Cir. Dec. 14, 1998) (remanded for consideration), but a person within seven months is not. Lambert v. Chater, 96 F.3d 469, 470 (10th Cir. 1996). The Tenth Circuit has cited cases holding that both ten months and seven months were not within the borderline. Daniels v. Apfel, 154 F.3d 1129, 1133 (10th Cir. 1998). In Daniels, the court held that the plaintiff's age (within 65 days of the advanced age category) presented a borderline situation. Although this court is reluctant to hold that within six months of the next age category is always a

20

borderline situation, whereas greater than six months is <u>never</u> a borderline situation, it is sufficient to note that in this case Plaintiff points to no record evidence other than age suggesting that he is unable to perform a range of light work, and he points to no case holding that a borderline situation exists in a situation such as this where the claimant's age was greater than six months from the next age category.

Plaintiff was born on October 8, 1962 (R. 38), and turned 55 on October 8, 2017. Thus, when the decision in this case issued, January 12, 2017, Plaintiff was more than eight months from his 55th birthday. In fact, he was only 4 days short of nine months from his 55th birthday. A period greater than six months is greater than half a year, and nine months is three-fourths of a year. Neither can be properly characterized as "a few days to a few months." Plaintiff has shown no error in the ALJ's application of the Grids in this case.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

Dated November 7, 2018, at Kansas City, Kansas.


s:/John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**